WOOD, Circuit Judge,
concurring in the judgment.
Although I agree without reservation with the majority’s conclusion that the district court correctly granted summary judgment for the defendants in this case, I am concerned that some aspects of its opinion are in tension with the governing Supreme Court doctrine on tying arrangements. For the reasons I explain briefly here, I would take a more cautious ap *322 proach, and leave further developments in tying law to the high court.
In Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the Supreme Court defined a tying arrangement as “an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.” Id. at 5-6, 78 S.Ct. 514. As the Court later made clear in Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), however, “every refusal to sell two products separately can not be said to restrain competition.” Id. at 11, 104 S.Ct. 1551. The trick is to distinguish between tying arrangements that are invalid and those that are innocuous, from a competitive standpoint. In Jefferson Parish, the Court explained the difference as follows:
Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller’s exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such “forcing” is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.
Id. at 12, 104 S.Ct. 1551. Going on, over the objection of Justice O’Connor (who concurred in the judgment because of this point), the majority had this to say about the analytical approach toward tying arrangements:
Per se condemnation — condemnation without inquiry into actual market conditions — is only appropriate if the existence of forcing is probable. Thus, application of the per se rule focuses on the probability of anticompetitive consequences.
Id. at 15-16, 104 S.Ct. 1551. The Court went on to describe the circumstances under which that probability would exist: first, there must be a substantial potential for impact on competition, which would be shown if a substantial volume of commerce is foreclosed by the arrangement; second, anticompetitive forcing must be likely, which is the case when it is probable that the seller has market power. Id. at 16-17, 104 S.Ct. 1551. If the seller does not have “either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product,” then the per se rule cannot be used and the arrangement must be assessed under a full rule of reason. Id. at 18, 104 S.Ct. 1551.
Despite Justice O’Connor’s forceful opinion concurring in the judgment, in which she argued that the time had come to jettison the per se rule in tying cases, see id. at 35, 104 S.Ct. 1551, and despite the opportunity it had as recently as March 2006 to take that step, see Illinois Tool Works Inc. v. Independent Ink, Inc., — U.S. -, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006), the Court has refused to do so. Illinois Tool Works held only that the fact that a tying product is patented does not support a presumption that the seller has market power over that product. See 126 S.Ct. at 1291. It concluded that “tying arrangements involving patented products should be evaluated under the standards applied in cases like Fortner II and Jefferson Parish rather than under the per se rule applied in Morton Salt and Loew’s,” both cases involving intellectual property (patents in Morton Salt, copyrights in Loew’s). In my view, Illinois Tool Works thus stands only for the proposition that a plaintiff must prove that a holder of intellectual property has “either the degree or *323 the kind of market power that enables him to force customers” to purchase the tied product. If a plaintiff can do so, then the framework established by Jefferson Parish continues to apply.
In the case before us, we must decide whether Reifert has produced enough evidence to survive summary judgment with respect to the allegation that the defendant Realtors Associations have tied the multi-listing service (MLS, the tying product) to membership in the Realtors Association of South Central Wisconsin, Inc. (RASCW, the tied product). The district court concluded that Reifert had not come forward with the requisite evidence. I agree. The D.C. Circuit offered a useful summary of the elements of a tying case in United States v. Microsoft Corp., 253 F.3d 34 (D.C.Cir.2001):
There are four elements to a per se tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce.
Id. at 85. Here, I am willing to say that Reifert has brought forth enough evidence to permit a trier of fact to rule in his favor on the first three of those elements. His proof fails, however, on the fourth.
The key point is not the measurement of how much commerce in the tied product market was affected. It is the fact that Reifert offered no evidence to show that there was any foreclosure in the tied product market. As far as we can tell from this record, no one refrained from joining any other organization because of the cost of membership in the Realtor Associations (RASCW and the others) before us. This is what distinguishes our case from the Eleventh Circuit’s opinion in Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566 (11th Cir.1991). In that case, the court explicitly rested its decision on foreclosure, to which it referred as the “coercion element,” explaining that “plaintiffs need to show that [defendant] Metro not only has [ ] market power but also has wielded this market power to force brokers to alter their choice of professional associations.” Id. at 1577. It then reported that the evidence in the record showed “that 400 of Empire’s prospective and current members did not join Empire or quit Empire because of the prohibitive cost.” Id. at 1578. This is precisely the type of showing that Reifert failed to make.
Analytically, the majority may well be right that the rule of reason approach it sees in Carl Sandburg Vill. Condo. Ass’n No. 1 v. First Condo. Dev. Co., 758 F.2d 203 (7th Cir.1985), would be a more sensible way to approach all tying cases. But it is not for this court to anticipate the Supreme Court’s overruling of its earlier decisions, even if the passage of time and the impact of later cases that create doctrinal tensions are evident to all. Just as we did in Khan v. State Oil Co., 93 F.3d 1358 (7th Cir.1996), overruled by State Oil Co. v. Khan, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), we should limit ourselves to pointing out the problems we see and then attempting to apply the law as it stands as best we can. In the present case, unlike State Oil, faithful application of the existing law leads to the same outcome as the more ambitious approach the majority has chosen. For that reason, I am happy to concur in the outcome that the majority reaches, but I must respectfully decline to join its opinion.